**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED FIRE & CASUALTY COMPANY, | ) | |
| | ) | |
| Plaintiff/Counter Defendant, | ) | |
| | ) | |
| v. | ) | No. 4:10-CV-2076 CAS |
| | ) | |
| TITAN CONTRACTORS SERVICE, INC., | ) | |
| | ) | |
| Defendant/Counter Claimant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on plaintiff/counter defendant United Fire & Casualty Company's ("United Fire") motion for summary judgment and defendant/counter claimant Titan Contractors Service, Inc.'s ("Titan") cross motion for summary judgment. The matter is fully briefed and ready for disposition. For the following reasons, the Court will deny United Fire's motion for summary judgment and grant Titan's cross motion for summary judgment.

**Background**

In this declaratory judgment action, plaintiff United Fire seeks a determination of its rights and obligations under a policy of insurance issued to defendant Titan. At issue is whether a concrete sealant Titan uses in its business, TIAH, is a pollutant under the pollution exclusion of Titan's comprehensive general liability policy.

Underlying this case is a personal injury action brought by three individuals, Tallauah Todd, Valerie Furlow, and Merri Bogard against Titan and the Alton Center Business Park in the Circuit Court of Madison County, Illinois arising out of their exposure to the chemical concrete sealant applied by Titan. Titan applied the sealant to a warehouse area adjacent to the

individuals' office space in the Alton Business Park.  Plaintiffs allege various injuries resulting

from this exposure, including headaches, wheezing, and throat irritation.

**Summary Judgment Standard**

      The standards applicable to summary judgment motions are well settled.  Pursuant to

Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all

of the information before the court shows "there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law."  See Celotex Corp. v. Catrett, 477 U.S.

317, 322 (1986); Board of Education, Island Trees v. Pico, 457 U.S. 853, 863 (1982).  "Where

the unresolved issues are primarily legal rather than factual, summary judgment is particularly

appropriate."  Cearley v. General Am. Transp. Corp., 186 F.3d 887, 889 (8th Cir. 1999) (citing

Crain v. Board of Police Commissioners, 920 F.2d 1402, 1405-06 (8th Cir. 1990)).

      Where parties file cross motions for summary judgment, each summary judgment motion

must be evaluated independently to determine whether a genuine dispute of material fact exists

and whether the movant is entitled to judgment as a matter of law.  Husinga v. Federal-Mogul

Ignition Co., 519 F. Supp. 2d 929, 942 (S.D. Iowa 2007).  "[T]he filing of cross motions for

summary judgment does not necessarily indicate that there is no dispute as to a material fact, or

have the effect of submitting the cause to a plenary determination on the merits."  Wermager v.

Cormorant Township Bd., 716 F.2d 1211, 1214 (8th Cir.1983).

      With this standard in mind, the Court accepts the following facts as true for purposes of

resolving this motion for summary judgment.

**Facts**

*Titan's Business*

      Titan is a construction clean up company.  Titan supplies day labor and cleans

construction projects when the projects are finished.  Titan also cleans and seals concrete floors. The exact breakdown of Titan's work is not entirely clear, but generally the bulk of Titan's gross receipts comes from its construction clean up work.  Titan operates out of an office located at 4134 Meramec Bottom Road, St. Louis, Missouri  63129.  Its principal place of business is in the State of Missouri.  Titan also works at various job sites in Illinois.

When Titan applied for commercial insurance with United Fire in 2003, it identified its premises as the office on Meramec Bottom Road and at 1305-1307 Lark Industrial Drive, Fenton, Missouri  63026.  Titan's coverage under the policy has remained largely the same over the years, with modifications to take into account Titan's changing business activities, employees, and equipment.  The general method by which Titan's premiums for the policy were calculated has remained the same over the years.  United Fire calculated Titan's premiums for the policy based on the classification of the work Titan was performing, the location where Titan performed that work, and the amount of that work as measured by Titan's payroll assigned to the work during the policy year.

Titan does business in both Missouri and Illinois.  The relative percentages of Titan's business in Missouri and in Illinois change from year to year.  In November 2004, approximately ten percent of Titan's work was performed in Illinois.  See Pl.'s Mem. in Opp'n to Defs.' Summ. J., Ex. Z-2.  According to Titan's President, Mark Melroy, historically about sixty percent of Titan's work has been in Missouri and forty percent of Titan's work has been in Illinois, although the percentages vary from year to year.  See Titan's SOF, Ex. 1, Melroy Aff. at ¶ 5(b).

*Underlying Personal Injury Action*

Merri Bogard, Valerie Furlow, and Tallauah Todd (the "tort plaintiffs") each filed lawsuits against Titan in the Circuit Court of Madison County, Illinois.  The tort plaintiffs allege

that Titan is liable for damages based on its application of TIAH, an acrylic concrete floor sealant, in a space occupied by Imperial Manufacturing Group in the Alton Center Business Park in Alton, Illinois.   On April 21, 2007, the tort plaintiffs were working for American Water Resources Company, Inc. in office space adjacent to Imperial Manufacturing Group.   Plaintiffs allege they were exposed to TIAH and were injured as a result of the exposure.   Specifically, Merri Bogard claims that she experienced shortness of breath, headaches, and wheezing and was diagnosed with chemically-induced asthma as a result of her exposure.   Tallauah Todd claims that she experienced severe headaches, wheezing, and disorientation, and was diagnosed with chemical exposure.   Valerie Furlow claims that she experienced headaches, wheezing, and throat irritation, and was diagnosed with chemical exposure/chemical pneumonitis.

United Fire agreed to provide Titan with a defense to the underlying personal injury suits subject to a reservation of rights.

*TIAH*

As part of Titan's construction clean up work, it applies concrete sealant after new construction is finished.   According to Phil L. Fuglsang, Titan's project estimator and manager, in 2007 Titan's concrete sealing work played a role in its construction clean up work "maybe 25 percent" of the time.   See Fuglsang Dep. at 9.   He approximated that he has used TIAH as a concrete sealer "maybe 5 to 10 times a year."   Id. at 19-20.   United Fire has submitted a "Loss Control Service Account Update Report" dated July 2007 that states:  "About 80% of [Titan's] gross receipts come from cleaning, about 15% are from interior demolition and the remaining 5% is from concrete sealing."   United Fire SOF, Ex. X.   Although Titan questions the admissibility of United Fire's report, and it appears the relevant part of this business record is hearsay, the Court finds that the exact percentage of Titan's work that can be attributed to

- 4 -

concrete sealing is immaterial.  What is material and apparent from the record is that at least five percent, and as much as twenty-five percent, of Titan's work involved sealing concrete floors.

The manufacturer of TIAH created product data sheets for TIAH.  One such product data sheet provides:

> Avoid prolonged breathing of vapors which can cause dizziness or suffocation. Avoid prolonged contact with skin as contact may irritate or burn skin and eyes . . . Fire may produce irritating or poisonous gases.  Runoff from fire control or dilution water may cause pollution.

Another product data sheet provides:

> Avoid direct contact with this product, as it may cause irritation to the eyes and/or skin.  Inhalation of vapors may result in transient central nervous system depression.

The material safety data sheet for TIAH provides:

> **EYE CONTACT**:  This product is presumed to be moderately irritating to the eyes.  Exposure may cause corneal injury.  Product vapors and/or mists may also be irritating to the eyes.

> **SKIN CONTACT:**  This product is presumed to be moderately irritating to the skin.  Prolonged contact may cause damage to the skin.  Prolonged or repeated contact may result in defatting and drying of the skin which may result in dermatitis.

> **INHALATION:**  Exposure may produce irritation to the nose, throat, respiratory tract, and other mucous membranes.  Exposure to excessive vapor concentrations may cause transient central nervous system depression.

*The Policy*

United Fire issued Titan a Commercial General Liability and Commercial Liability Umbrella Policy Number 60328503 for the policy period October 5, 2006 to October 5, 2007 (the "policy").  Titan applied for and purchased this insurance through its agent, NEC Insurance, Inc., which is located in Pacific, Missouri.

The Commercial General Liability policy part provides as follows:

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.      Insuring Agreement**

**a.**      We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

The Commercial General Liability policy also part provides as follows:

**TOTAL POLLUTION EXCLUSION WITH A HOSTILE FIRE EXCEPTION**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2., Exclusions of Section I – Coverage A – Bodily Injury and Property Damage Liability** is replaced by the following:
This insurance does not apply to:

**f.      Pollution**

**(1)**      "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

(a)      At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

(b)      At any premises, site or location on which any insured or any contractors or subcontractors working directly or

> indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants."

**(2)**   Any loss, cost or expense arising out of any:

(a)   Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

(b)   Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

The Commercial General Liability policy part provides a definition of "pollutants" as follows:

**SECTION V – DEFINITIONS**
. . .
**15.**   "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

The only exclusion United Fire cited in its complaint was the "Pollution" exclusion as modified to become "EXCLUSION TOTAL POLLUTION WITH A HOSTILE FIRE EXCEPTION CG 21 55 (09-99)."

**Discussion**

Before examining whether the pollution exclusion applies to bar coverage under the insurance policy, the Court must first examine which state's substantive law applies to the insurance coverage dispute.  Titan argues that Illinois law applies; United Fire argues that Missouri law applies.

**I.      Conflict of Law Analysis**

In a case where federal jurisdiction is based on diversity of citizenship, the law of the

- 7 -

forum state is applied when deciding choice of law issues.  Klaxon Co. v. Stentor Electrical Mfg. Co., 313 U.S. 487 (1941); Whirlpool Corp. v. Ritter, 929 F.2d 1318, 1320 (8th Cir. 1991). Missouri follows the Restatement (Second) of Conflict of Laws sections 188 and 193 to determine choice of law issues in insurance contract actions.  Viacom, Inc. v. Transit Cas. Co., 138 S.W.3d 723, 724-25 (Mo. 2004) (en banc).

The Eighth Circuit has discussed the interplay between sections 188 and 193 succinctly as follows:

> Section 188 is a general choice-of-law test for use when a contract contains no choice-of-law provision.  It is a multi-factored test for assessing the contacts a state has with the parties and the underlying events in a case.  See Viacom, 138 S.W.3d at 725 (describing section 188).  Section 193 is a more specific choice-of-law provision that addresses "contracts of fire, surety or casualty insurance" and treats the principal location of the insured risk as the most important factor in the choice-of-law determination.  See Restatement (Second) of Conflict of Laws § 193 ("The validity of . . . [the] insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy . . . .").

St. Paul Fire & Marine Ins. Co. v. Building Constr. Enters., Inc., 526 F.3d 1166, 1168 (8th Cir. 2008).

Because the policy at issue is a liability insurance contract, our analysis begins with section 193.  Pursuant to section 193, the Court shall apply the law of "the state which the parties understood was to be the principal location of the insured risk during the term of the policy . . . ." Restatement (Second) of Conflict of Laws § 193 (1971).  The comment section informs this analysis.  The principal location of an insured risk, i.e., the "activity that is the subject matter of the insurance," is "the state where it will be during at least the major portion of the insurance period."  Id. at cmt. b.  As the comments to section 193 discuss, in instances in which the insurance covers immovable objects, it is easy to predict where the risk will be located, or at least principally located, during the policy period.  In our case, however, the insurance covers the

liability associated with a contractor's business operations.  The insured risk, therefore, is not an immovable object such as a particular building or house.

Based on the evidence, the Court can determine the state where Titan was operating "during at least the major portion of the insurance period."  Id. at cmt. b.  According to the affidavit of Mark Melroy, historically about sixty percent of Titan's business operations were in Missouri.  Other evidence indicates that as much as ninety percent of Titan's business operations have been in Missouri.  See Pl.'s Mem. in Opp'n to Defs.' Summ. J., Ex. Z-2.  Regardless of the exact percentage associated with Titan's Missouri operations, the evidence shows that at least sixty percent of Titan's business was in Missouri.  Accordingly, Titan's business activity that is the subject matter of the policy has its principal location in Missouri—the state where it was "during at least the major portion of the insurance period."

Despite the rather clear definition of "insured risk" and "principal location" in comment (b) to Restatement section 193, Titan argues that "there is no question" the insured risk giving rise to the claims was in Illinois.  See Titan Summ. J. Mem. at 12.  Titan construes section 193 far too narrowly and overlooks the key definitions provided in comment (b).  While the activity that is the subject matter of the underlying suit took place in Illinois, that is not the "insured risk" under section 193.  Rather, the insured risk is the "activity which is the subject matter of the *insurance*," namely Titan's business operations and its principal location is "the state where it will be during at least the major portion of the insurance period."  Restatement (Second) of Conflict of Laws § 193 cmt. b (emphasis added).  At least sixty percent, and as much as ninety percent, of Titan's business was located in Missouri.  Missouri is the principal location of the insured risk during the term of the policy.

Titan also argues that comment (f) to section 193 controls this case.  Comment (f)

concerns multiple risk policies that insure against risks located in several states and the special problems they present.  Comment (f) does not deal with situations like Titan's policy, where the policy provides commercial liability coverage to all Titan's business operations, regardless of where they may be.  Comment (f) contemplates an insurance policy that insures several immovable, static risks located in different states.  The example used in comment (f) is a policy that insures dwelling houses located in states X, Y, and Z.  In this instance, the single policy will incorporate special statutory forms of the several states involved.  That is not our case.  In St. Paul Fire & Marine Insurance Co. v. Building Construction Enterprises, Inc., 484 F. Supp. 2d 1004, 1008-09 (W.D. Mo. 2007), aff'd, 526 F.3d 1166 (8th Cir. 2008), the court dealt with this precise choice of law issue, and found comment (f) inapposite.  "[T]he commercial general liability policies at issue in the present case did not contemplate a set of enumerated construction job sites but rather were intended to cover [the contractor's] commercial operations wherever they happened to occur, including projects yet to begin when the policies were delivered. . . . The logic of Comment f is therefore inapposite to the case at hand."  Id. at 1009.  The Court adopts the reasoning of the St. Paul Fire & Marine court, and finds comment (f) inapplicable to the situation presented here.

As the comments to section 193 state, however, there are situations in which the location of the risk has less significance, including "where the policy covers a group of risks that are scattered throughout two or more states."  Restatement (Second) of Conflict of Laws § 193 cmt. b.  The importance of the principal location of the insured risk varies from case to case.  It is most significant when the risk is immovable.  In the case of movable objects, the significance of the state of the risk's principal location "diminishes with the length of time that it can be anticipated the chattel will be in other states during the term of insurance."  Id.  In our case,

although the Court finds that the risk's principal location is Missouri, the Court is not inclined to give this factor greater weight than any other single contact.  The significance of this factor is diminished because the parties anticipated that Titan's risk would be in other states during the term of insurance.

Thus, the Court must consider the five factors enumerated in section 188.  Section 188 provides that the law of the state with the most significant relationship to the transaction and parties governs.  The contacts that direct this analysis are:  (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.  See Restatement (Second) of Conflict of Laws, § 188 (1971).

Missouri is the place of contracting, the place of negotiation of the contract, the place of performance for the majority of the contract, the primary location of the majority of Titan's business, and the physical location of Titan's offices.  The only section 188 factor that tips slightly in favor of Illinois is that Titan is incorporated in Illinois.  The largest grouping of relevant contacts, however, is in Missouri.  See, e.g., St. Paul Fire & Marine, 484 F. Supp. 2d at 1007-08 (applying sections 188 and 193 and finding Missouri law governed commercial general liability policy issued to Missouri contractor where work at issue was performed in Kansas); Becker Metals Corp. v. Transp. Ins. Co., 802 F. Supp. 235, 238-29 (E.D. Mo. 1992) (applying sections 188 and 193 and finding Missouri law applicable to CGL policy issued to Missouri company where claim involved an Illinois site); Superior Equip. Co. v. Maryland Cas. Co., 986 S.W.2d 477, 480-81 (Mo. Ct. App. 1998) (finding Missouri law governed insurance contract where insured was in Missouri during major portion of insured period, was a Missouri corporation with principal place of business in Missouri, policy negotiated through a Missouri

broker and executed in Missouri, and only factor favoring Illinois law was the location of the contaminated site at issue).

Titan argues that Illinois law applies because the parties "clearly contemplated that for some risks the Policy would be governed by Illinois substantive law."  Titan Summ. J. Mem. at 12.  For support, Titan points to the parallel Missouri and Illinois state-specific provisions included in the policy.  For example, the policy includes an employment-related practices exclusion for Missouri and Illinois; an amendment of liquor liability exclusion for Missouri and Illinois; a nuclear energy liability exclusion for Missouri and Illinois; and, as relevant here, a total pollution exclusion with a hostile fire exception for Missouri and Illinois.  There is no dispute, however, that the parties did not agree to a choice of law provision.  Titan cites no case law or other authority to support its argument that by merely inserting state-specific policy provisions, the parties intended that a particular state's law would apply to a particular risk.[1]  Titan cites only to cases that recite general principles of insurance contract analysis.  Because the parties did not agree to a choice of law provision, it is the Court's job to analyze which state's law applies.  United Fire's insertion of state-specific provisions into an insurance policy does not truncate that analysis.

Also, Titan argues Illinois substantive law applies to this coverage dispute because it was charged a premium based on its relative risk of exposure in Missouri and Illinois.  The fact that Titan paid higher premiums because of its exposure to liability in Illinois does not alter or inform

---

[1] Even if by inserting parallel state-specific provisions the parties had implicitly agreed that Illinois law would apply to certain risks, the Court would have no way of knowing which risks were to be governed by Illinois provisions and which were to be governed by Missouri provisions.  Titan assumes, without analysis, that the parties meant for Illinois law to apply to liability occurring in Illinois, and for Missouri law to apply to liability occurring in Missouri. There is nothing in the insurance contract, however, that would dictate this result.

the choice of law analysis.  Titan is confusing the underlying liability issue with the insurance coverage issue.  The potential underlying liability in Illinois does not affect the determination of which state has the most significant contacts to the insurance contract—Missouri.

Titan relies on Dillard v. Shaughnessy, Fickel and Scott Architects, Inc., 943 S.W.2d 711 (Mo. Ct. App. 1997), to support its argument that Illinois law should apply.  In Dillard, the Missouri court applied Kansas state law to a construction contract for masonry work on a Kansas building project.  Dillard is distinguishable on several grounds.  First, it involved a construction contract, not an insurance contract.  Section 193 of the Restatement (Second) of Conflicts of Law, therefore, was never applied.  Second, although the subcontract at issue did not have a choice of law provision, it incorporated portions of a general contract that did have a choice of law provision.  The general contract chose Kansas state law.  Because the Missouri court found the five factors set out in section 188 were essentially tied between favoring Kansas law and Missouri law, and because the subcontract incorporated portions of the general contract, which applied Kansas law, the Court determined Kansas law applied.  In the end, the Missouri court applied the law of the state in which the accident occurred, but not because the accident occurred there.  The Dillard case has little relevance here.

Finally, the application of Missouri law to this coverage issue fosters the principles set out in sections 6(d), 6(f), and 6(g) of the Restatement (Second) of Conflict of Laws—these are certainty, predictability, and uniformity of result; ease in determination and application of the law to be applied; and protection of the justified expectation of the parties.  Consistent with these principles, the pollution exclusion should apply consistently to Titan's activities based on the nature of the activity itself, not based on the state in which the activity occurs.  It would be inconsistent with the principles of Restatement section 6 for Titan's insurance policy to cover its

concrete sealing activities in Illinois, but (as United Fire argues) not cover the same activities in Missouri.  Considerations of certainty, predictability, uniformity of result, ease, and justified expectations dictate that Missouri law apply to coverage disputes arising out of an insurance contract negotiated and executed in Missouri by a company located in Missouri, whose principal location of risk is in Missouri.

## II.    Coverage Analysis

United Fire moves for summary judgment based on the pollution exclusion, arguing that under Missouri law the underlying claims were caused by exposure to pollutants.  United Fire argues that this case involves a straightforward analysis.  It states that TIAH is an irritant, and points to the product data materials provided by the manufacturer for support.  These product materials state that TIAH may cause "irritation of the eyes and/or skin"; contact with skin "may irritate or burn skin and eyes"; "the product is presumed to be moderately irritating to the eyes" and "moderately irritating to the skin"; and exposure by inhalation may produce "irritation to the nose, throat, respiratory tract, and other mucous membranes."  United Fire counters Titan's arguments, stating that Missouri courts have not limited the pollution exclusion to traditional environmental pollutants, pollutants specifically identified in the policy, or pollutants that are dispersed outside.

In its cross motion for summary judgment, Titan acknowledges that the Missouri Supreme Court has never addressed the meaning of the total pollution exclusion, and there is no Missouri appellate decision directly on point.  Titan argues, however, that the most apposite Missouri decision is Hocker Oil Co., Inc. v. Barker-Phillips-Jackson, Inc., 997 S.W.2d 510 (Mo. Ct. App. 1999).  Titan states that similar to the alleged pollutant in Hocker Oil (gasoline), here TIAH was sold by Titan as a product in the ordinary course of its services to its customers.  So,

- 14 -

considered from the perspective of the layman who acquired the policy of insurance, Titan's interpretation of TIAH being a product—and not a pollutant—is reasonable.  Titan argues the policy is at least ambiguous as to whether TIAH is a pollutant for purposes of the exclusion, and the policy provision must be construed against United Fire.

Both parties agree that the Missouri Supreme Court has not interpreted the total pollution exclusion.  Thus, this Court will have to predict how the Missouri Supreme Court would resolve the issue.  "Decisions of the various intermediate appellate courts are not [binding on this Court], but they are persuasive authority, and we must follow them when they are the best evidence of what [the state] law is."  Continental Cas. Co. v. Advance Terrazzo & Tile Co. Inc., 462 F.3d 1002, 1007 (8th Cir. 2006) (quoting Garnac Grain Co., Inc. v. Blackley, 932 F.2d 1563, 1570 (8th Cir. 1991)).  This Court must consider the rather inconsistent precedents of the Missouri Court of Appeals, and predict how the Missouri Supreme Court would resolve the issue of whether TIAH is a pollutant under the policy.  In their briefing, the parties pick and choose which Missouri cases they want the Court to rely upon, so the Court will engage in a chronological review of the most relevant Missouri cases on the pollution exclusion.

In Hocker Oil, 997 S.W.2d 510, the Missouri Court of Appeals for the Southern District found the policy's pollution exclusion did not preclude coverage for property damage caused when a gasoline tank at one of the plaintiff's service stations failed, and 2,000 gallons of gasoline were released into the ground and migrated to adjoining land.  The landowner sued the plaintiff and after settling the suit, the plaintiff sought indemnification from its insurer.  The insurer denied coverage on the basis of the applicable policy's pollution exclusion.  The plaintiff appealed, arguing that gasoline was its product and not a pollutant.  Id. at 513.  The Missouri Court of Appeals noted that gasoline had not been identified with particularity as a pollutant in

the insurance policy, and determined the plaintiff "could have reasonably concluded that gasoline was not deemed a pollutant for purposes of the exclusion since it was not specifically identified as such." Id. at 518.  Notably, the court observed "it would be an oddity for an insurance company to sell a liability policy to a gas station that would specifically exclude that insured's major source of liability." Id.

In an attempt to analogize the facts of this case to the facts of Hocker Oil, Titan argues that it sold TIAH to its customers in the ordinary course of business, and like the gas at issue in Hocker Oil, TIAH is a "product" and not a "pollutant."  United Fire counters that Titan is not in the business of transporting, selling, and storing TIAH, unlike the insured in Hocker Oil; Titan is a construction clean up company.  It does not sell TIAH like a department store or a convenience store sells products, and it does not sell TIAH like a gas station sells gas.

Both parties interpret Hocker Oil's relevance too narrowly.  United Fire is correct that Titan is not in the business of selling TIAH, and therefore the distinction made in Hocker Oil between a "product" and a "pollutant" is not entirely relevant here.  What is relevant is that the Missouri Court of Appeals did not take a literal approach to interpreting the pollution exclusion.[2] The Hocker Oil court ascertained whether an insurance policy is plain and unambiguous by looking to what the layman acquiring the policy ordinarily would have understood. Id. at 518. "In this light, Hocker's suggestion that it, as a layperson, would not have paid a substantial

---

[2] As commentators and other courts have discussed, there are two main approaches when it comes to interpreting pollution exclusions:  the literal approach, and the situational approach. See State Auto. Mut. Ins. Co. v. Flexdar, Inc., 964 N.E.2d 845, 850-51 (Ind. 2012) (citing Apana v. TIG Ins. Co., 574 F.3d 679, 682-83 (9th Cir. 2009)); see also Couch on Insurance 3d § 127:6 (2008).  Courts applying the literal approach generally hold the absolute pollution exclusion to be unambiguous in all circumstances, which often leads to odd and unreasonable results.  See State Auto Mut. Ins. Co., 964 N.E.2d at 851 (citing Maxine Furs, Inc. v. Auto-Owners Ins. Co., 426 F. App'x 687, 688 (11th Cir. 2011) (per curiam) (holding that the smell of curry from Indian restaurant that damaged merchandise in adjacent fur salon was a "contaminant" under the pollution exclusion and the damage was not covered)).

premium for a liability policy that would not afford coverage for damages resulting from gasoline leaks from its storage tanks is not unreasonable." Id.

As further indication of the Missouri court's willingness not only to look at the alleged pollutant, but to look at the alleged pollutant through the eyes of the insured, the court states: "Gasoline belongs in the environment in which Hocker routinely works. . . . [I]n that environment, gasoline is not a pollutant." Id. This approach informs the Court's analysis of whether TIAH is a pollutant in the context of a construction clean up business. Importantly, as much as twenty-five percent of Titan's clean up business involves applying concrete sealant after new construction is finished. See Fuglsang Dep. at 9.

Two months after Hocker Oil, the Missouri Court of Appeals for the Southern District examined another absolute pollution exclusion, this time in the context of toxic sludge. In Casualty Indemnity Exchange v. City of Sparta, 997 S.W.2d 545 (Mo. Ct. App. 1999), the court held that sludge containing "substances and compounds toxic to humans and animals, i.e., fluoride, cadmium, lead, mercury, iron, arsenic, aluminum, selenium and molybdenum" applied to land as fertilizer, which caused damage to a neighboring farm including diminished milk production, death of cows, and loss of breeding opportunity, was a pollutant under the absolute pollution exclusion. Id. at 546. The court engaged in a straightforward analysis, finding that the pollution exclusion barred coverage for claims arising out of exposure to toxic substances; the underlying plaintiffs pled the sludge contained substances toxic to humans and animals; and therefore the underlying claims were excluded from coverage under the pollution exclusion. Id. at 549-50.

While the Casualty Indemnity Exchange court found the pollution exclusion applicable under the facts of the case, it refused to speculate about other substances in other cases.

"Whether the Absolute Pollution Exclusion might be found ambiguous regarding some other substance in a different factual setting is a subject about which this court need not speculate." Id. at 551.  The court also distinguished an Arkansas case in which a septic system in a mobile home park broke down and flooded a resident's home with sewage.  In the case of the septic system, the Arkansas state court found the pollution exclusion inapplicable.  The Missouri court, faced with a case involving a similar pollutant, declared an "immense difference between a mobile home park providing a septic system for its occupants and a municipality collecting and disposing of sewage generated within the municipality." Id. at 552.  Although this "immense difference" is not specified, the opinion suggests that the Missouri court found the smaller "magnitude" and "relatively small dimension" of the septic system overflow to not trigger the pollution exclusion. Id. at 552.

A year after the Hocker Oil and Casualty Indemnity Exchange decisions, the Missouri Court of Appeals for the Eastern Division engaged in a different and more literal analysis of the pollution exclusion in Boulevard Investment Company v. Capitol Indemnity Corporation, 27 S.W.3d 856 (Mo. Ct. App. 2000).  In Boulevard, the insured owned a restaurant whose plumbing system was blocked by "various forms of waste, including kitchen grease, scour pads, heavy plastic, and underwear." Id. at 857.  The pollution exclusion at issue defined pollutants as "any solid, liquid, gaseous, or thermal irritant or contaminant including . . . waste." Id. at 858.  In a two-page opinion, the Missouri court noted the issue was one of first impression, and consulted Webster's Dictionary for the definition of "waste."  Upon finding that Webster's defined waste to include "garbage, rubbish, excrement, and sewage," the court found that the kitchen grease and scour pads clogging the plumbing system were waste within the ordinary meaning of the word.  Consequently, it held that this sundry kitchen waste was a "pollutant" under the policy

and fell within the pollution exclusion barring coverage for the property damage.

Less than one year after the opinion in Boulevard, however, the Missouri Court of Appeals for the Eastern District issued a different type of opinion in Cincinnati Insurance Company v. German St. Vincent Orphan Association, Inc., 54 S.W.3d 661 (Mo. Ct. App. 2001). In this case, the court applied the pollution exclusion to bar coverage for asbestos exposure after the insured hired a contractor to remove an old vinyl floor containing asbestos.  Although Cincinnati Insurance Company is of little precedential value in determining whether Missouri courts would find TIAH to be a pollutant, it is significant because the Missouri Court of Appeals took a slight turn from its more literal reading of pollutant in Boulevard.  In its opinion, the court agreed with a Kansas federal court that it is questionable whether some substances should be considered pollutants.  Specifically, the Missouri court discussed Westchester Fire Insurance Company v. City of Pittsburgh, Kansas, 768 F. Supp. 1463, 1470 (D. Kan. 1991), in which the court, applying Kansas law, found that an insecticide mixture, Zep Formula 2162 containing malathion, sprayed off the back of a municipal truck could not be considered a pollutant under the policy.  The Missouri Court of Appeals agreed with the Westchester court "that it is questionable whether an 'insecticide of low mammalian toxicity' should be considered a pollutant." Id. at 666.  In the end, however, the Cincinnati Insurance Company court stated that the friable asbestos at issue in its case unquestionably fell into the category of a "solid or thermal 'irritant' or 'contaminant'" as used in the policy.  Id. at 666.

Had the Cincinnati Insurance Company court been applying a literal interpretation of the pollution exclusion, as it did in Boulevard, it would have been hard-pressed to agree with the federal court's Westchester holding that a chemical insecticide was not a pollutant under the relevant policy, which specifically excluded chemicals.  In less than one year, the Missouri Court

of Appeals of the Eastern District went from finding kitchen grease and scour pads to be pollutants in Boulevard, to agreeing that it was questionable whether a chemical insecticide should be considered a pollutant.

The most recent decision from the Missouri Court of Appeals is Heringer v. American Family Mutual Insurance Company, 140 S.W.3d 100 (Mo. Ct. App. 2004).  In Heringer, the Missouri court found that the pollution exclusion applied to injuries a contractor sustained scraping paint from the interior and exterior of the insured's home.  Unbeknownst to the contractor, the paint was lead-based, and the contractor was exposed to toxic quantities of lead while using a heat gun to remove the paint.  The Heringer case was rather straightforward, because the policy definition of "pollutant" specifically included lead:  "Pollutant means any solid, liquid, gaseous or thermal irritant . . . including, but not limited to lead . . . ."  Id. at 103.  Unlike the present case, the issue in Heringer was not the interpretation of a general definition of pollutant; the Heringer policy specifically and unambiguously defined lead as a pollutant in the policy.  In fact, the Heringer court rejected analyses in which the pollutant was not specifically defined in the policy.  Id. at 105.  So, this case is not of significant value to our analysis.  See also Hartford Underwriter's Ins. Co. v. Estate of Turks,  206 F. Supp. 2d 968, 975 (E.D. Mo. 2002) (finding lead paint to be pollutant where policy definition of pollutant specifically included lead paint).

Titan also relies on the Eighth Circuit Court of Appeals' interpretation of Missouri law in Sargent Construction Company, Inc. v. State Auto Insurance Company, 23 F.3d 1324 (8th Cir. 1994).  In Sargent, the Eighth Circuit, applying Missouri law, examined whether a solution of muriatic acid used on a concrete floor by a contractor that resulted in damage to the property owner's fixtures was a pollutant within the meaning of the contractor's insurance policy's

pollution exclusion.  The insured offered evidence that laypersons in the construction business would not consider muriatic acid to be a pollutant.  The policy defined "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant" and then listed examples of such substances. The Eighth Circuit concluded that when the definition was applied to a particular substance, the issue became whether the substance could be classified as an "irritant or contaminant."   The Court found that the policy's definition of "pollutant" was ambiguous because in the context of the claim for bodily injury or property damage, a substance could be an "irritant or contaminant" if it in fact caused a covered injury, or if it merely had the capability of causing a covered injury, regardless of whether the accident giving rise to the specific claim involved the harm.  Id. at 1327.  Because the Eighth Circuit found the policy definition of "pollutants" was ambiguous, the court reversed the trial court's ruling on summary judgment that muriatic acid fell within the pollution exclusion.

The policy definition of pollutant in this case is the same as that in Sargent, and therefore similar ambiguities exist.  In the nearly nineteen years since the Sargent opinion was decided, however, Missouri courts have not found ambiguity in pollution exclusions because of the distinction between whether an irritant or contaminant actually caused an injury, or was merely capable of causing an injury.  See, e.g., Casualty Indemnity Exchange, 997 S.W.2d at 551 ("This court fails to see how Sargent governs the instant case.").  So, although a similar ambiguity exists in this case, the Court does not find this ambiguity to be determinative.

Rather, the Court is guided by several principles of insurance policy interpretation as gleaned from its review of the pollution exclusion under Missouri law.  First, for the most part, Missouri courts have taken a common sense, situational approach in determining whether a particular substance is a pollutant under policy language.  See, e.g., Hocker Oil, 997 S.W.2d at

518; Cincinnati Ins. Co., 54 S.W.3d at 665-66; see also Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co., 976 F.2d 1037, 1043-44 (7th Cir. 1992) (applying Missouri law) ("The distinction we draw here between pollution and non-pollution is by no means scientific, but one must remember that insurance contract interpretation is at bottom a practical art.") (internal quotation omitted).   Second, the determination of whether a substance is a pollutant is fact intensive.   Casualty Indem. Exch., 997 S.W.2d at 548 ("[C]ourts microscopically examine exclusions and assiduously study facts to determine whether a particular exclusion bars coverage for a specific claim.").   Third, whether an insurance policy's language is plain and unambiguous is determined by what the layman who bought and paid for the policy would ordinarily have understood.   Hocker, 997 S.W.2d at 516-18; Cincinnati Ins. Co., 54 S.W.3d at 666.   Moreover, the insured is entitled to characterize the allegedly polluting substance in a manner consistent with the insured's daily activities, particularly if the alleged pollutant belongs in the environment in which the insured routinely works.   Hocker, 997 S.W.2d at 518.   The exclusion may not apply if the court finds the definition of pollutant to be beyond the reasonable expectations of the insured.   Id.   Finally, Missouri courts will not limit the pollution exclusion to traditional environmental pollutants.   Heringer, 140 S.W.3d at 106.

Applying the Missouri precedents to the instant case, the Court concludes there is ambiguity in the policy language as it relates to Titan's allegedly negligent application of TIAH to seal the concrete floor.   Titan's estimator and project manager, Phil Fuglsang, testified that "maybe 25 percent" of the role Titan plays in construction clean up is applying concrete sealant after new construction is finished.   Fuglsang Dep. at 9.   United Fire's own reports indicate that at least five percent of Titan's business is in concrete sealing.   Although Titan used different sealants for different customers, Mr. Fuglsang estimated that he used TIAH approximately five

to ten times per year.  Id. at 20.  Thus, the underlying plaintiffs' exposure to TIAH occurred in the normal course of Titan's business of sealing concrete floors.

Like the gasoline at issue in Hocker Oil, TIAH belongs in the environment in which the insured routinely works.  "Missouri's criteria for determining whether an insurance policy's language is plain and unambiguous requires ascertainment of what the layman who acquired the policy of insurance would ordinarily have understood."  Hocker Oil, 997 S.W.2d at 518.  It is reasonable for Titan to expect that its work in sealing concrete floors would be covered by its commercial general liability insurance policy, and that TIAH would not be deemed a pollutant. The Court is not persuaded by the rather inconsistent holdings of the Missouri Court of Appeals that under Missouri law the pollution exclusion unambiguously precludes Titan from insurance coverage for its common business activity.

This is not an easy case; it is a close case.  Because United Fire is seeking to avoid coverage under the exclusion, "it has the burden of proving the applicability of the exclusion." Heringer, 140 S.W.3d at 103.  "Exclusionary clauses in insurance policies are strictly construed against the insured."  Casualty Indem. Exch., 997 S.W.2d at 548.  Because any ambiguity in the policy must be construed in favor of the insured, and because exemptions to coverage are strictly construed against the insurer, the Court finds that the pollution exclusion does not bar coverage for the underlying tort plaintiffs' injuries.  The scope of the pollution exclusion is governed by the expectations of a reasonable policy holder, and the Court finds that a reasonable policy holder in Titan's position would not expect that injury or damage arising from its use of TIAH in the course of its business would be considered pollution within the meaning of the policy's pollution exclusion.  In light of the inconsistent rulings of the Missouri Court of Appeals, no reasonable policy holder would expect that an insurance policy issued to a contractor, that cleans

and seals concrete floors in the course of its business, unambiguously excluded coverage for injuries suffered when office workers in adjoining office space were exposed to fumes from the concrete sealant.[3]

**Conclusion**

For these reasons, the Court finds that United Fire has not met its burden to establish that the pollution exclusion, when strictly construed against it, is clearly applicable as a matter of law to bar any coverage to Titan based on the underlying claims. United Fire's motion for summary judgment should therefore be denied, and Titan's motion for summary judgment should therefore be granted.

Accordingly,

**IT IS HEREBY ORDERED** that defendant Titan Contractors Service, Inc.'s motion for summary judgment is **GRANTED**. [Doc. 66]

**IT IS FURTHER ORDERED** that plaintiff United Fire & Casualty Company's motion for summary judgment is **DENIED**. [Doc. 69]

**IT IS FURTHER ORDERED**, **ADJUDGED and DECLARED** that plaintiff United Fire & Casualty Company has a duty under the commercial general liability policy issued to defendant Titan Contractors Service, Inc. ("Titan") to defend and indemnify Titan on the claims asserted against it by (1) Merri Bogard in Case No. 09-L-295 in the Circuit Court for the Third

---

[3] Cases from other jurisdictions involving fumes from floor sealants, glues, and chemicals are inconsistent. The Court does not find these cases persuasive. Compare Meridian Mut. Ins. Co. v. Kellman, 197 F.3d 1178 (6th Cir. 1999) (finding movement of fumes from chemical floor sealant was not "discharge, dispersal, seepage, migration, release or escape" within terms of policy's pollution exclusion); Calvert Ins. Co. v. S&L Realty Corp., 926 F. Supp. 44, 46-47 (S.D.N.Y. 1996) (fumes from cement used to install plywood floor not a pollutant); Freidline v. Shelby Ins. Co., 739 N.E.2d 178, 184 (Ind. Ct. App. 2001) (fumes from carpet glue not a pollutant), rev'd on other grounds, 774 N.E.2d 37, 42 (Ind. 2002) with Firemen's Ins. Co. v. Kline & Son Cement Repair, Inc., 474 F. Supp. 2d 779, 790-93 & n.6 (E.D. Va. 2007) (finding fumes from epoxy/eurathane sealant are pollutants) (citing cases).

Judicial Circuit, Madison County, Illinois; (2) Valerie Furlow in Case No. 09-L-296 in the Circuit Court for the Third Judicial Circuit, Madison County, Illinois; and (3) Tallauah Todd in Case No 09-L-297 in the Circuit Court for the Third Judicial Circuit, Madison County, Illinois arising out of the incident involving Titan's application of the concrete sealant, TIAH, on or about April 20, 2007.

An appropriate judgment will accompany this memorandum and order.

_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this  28th  day of January, 2013.